# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ANDREW W. LUSSON, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>PETMED EXPRESS, INC., MENDERES AKDAG, and BRUCE S. ROSENBLOOM,<br>　　　　　　　　　　Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Andrew W. Lusson ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by PetMed Express, Inc., ("PetMed" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by PetMed; and (c) review of other publicly available information concerning PetMed.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that acquired PetMed's securities between May 8, 2017, and August 23, 2017, inclusive (the "Class Period"), against the Defendants,[1] seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. PetMed does business as "1-800-PetMeds," and is purportedly a nationwide pet pharmacy that markets prescription and non-prescription pet medications, and other health products for dogs and cats, direct to consumers. The Company claims that it markets its products through national advertising campaigns, which aim to increase the recognition of the "1-800-PetMeds" brand name, and "PetMeds" family of trademarks, increase traffic on its website (www.1800petmeds.com), acquire new customers, and maximize repeat purchases.

3. On August 23, 2017, Aurelius Value published a research report on PetMed alleging that that the Company was aggressively market dangerous painkillers to human opiate addicts and drug users. Aurelius Value claimed, among other things, that: (1) PetMed was pushing a "dangerous and addicting synthetic opiate" named Tramadol, a class IV substance, which is unique in that it is prescribed by vets to animals as well as by doctors to human cancer patients; (2) PetMed is exploiting the opioid crisis through a broad marketing blitz that features Tramadol in ads that specifically target human opiate users searching for how to get high or

---

[1] "Defendants" refers to PetMed Express, Inc., Menderes Akdag, and Bruce S. Rosenbloom, collectively.

quickly score a variety of different opiates, narcotics, and street drugs without a prescription; and (3) PetMed's ads even specifically bait opiate addicts searching for *remedies* for their withdrawal symptoms. Aurelius Value also expressed concern that PetMed's marketing was likely to capture the attention of regulators, including the FDA and DEA, which have taken a dim view of direct to consumer advertisements of controlled substances, and that Google may bring a sudden halt to PetMed's advertising activities.

4. On this news, the Company's stock price fell $3.19 per share, more than 8%, to close at $36.22 per share on August 23, 2017, on unusually heavy trading volume.

5. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company was marketing dangerous and addictive animal drugs to humans; (2) that, as such, the Company is vulnerable to potential civil or criminal liability, as well as other regulatory action; (3) that, as a result of the foregoing, Google may halt the Company's advertising activities; and (4) that, as a result of the foregoing, Defendants' statements about PetMed's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

6. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts

charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this Judicial District.

10. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased PetMed securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12. Defendant PetMed Express, Inc. is incorporated in Florida and its headquarters are in Delray Beach, Florida. PetMed's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "PETS."

13. Defendant Menderes Akdag ("Akdag") was the Chief Executive officer ("CEO") of PetMed at all relevant times.

14. Defendant Bruce S. Rosenbloom ("Rosenbloom") was the Chief Financial officer ("CFO") of PetMed at all relevant times.

15. Defendants Akdag and Rosenbloom (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of PetMed's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew

that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

16. PetMed does business as "1-800-PetMeds," and is purportedly a nationwide pet pharmacy that markets prescription and non-prescription pet medications, and other health products for dogs and cats, direct to consumers. The Company claims that it markets its products through national advertising campaigns, which aim to increase the recognition of the "1-800-PetMeds" brand name, and "PetMeds" family of trademarks, increase traffic on its website (www.1800petmeds.com), acquire new customers, and maximize repeat purchases.

### Materially False and Misleading Statements Issued During the Class Period

17. The Class Period begins on May 8, 2017. On that day, the Company issued a press release entitled "PetMed Express, Inc. D/B/A 1-800-PETMEDS Announces Its Financial Results for Fiscal 2017 and Its Quarterly Dividend Raised to $0.20 Per Share." Therein, the Company stated:

*Fourth Quarter Net Income Increased 38%*

*Fourth Quarter New Order Sales Increased 17%*

*Fourth Quarter Net Sales Increased 14%*

DELRAY BEACH, Fla., May 08, 2017 (GLOBE NEWSWIRE) -- PetMed Express, Inc. (NASDAQ:PETS) today announced its financial results for the fiscal year ended March 31, 2017. Net sales for the quarter ended March 31, 2017 were $63.0 million, compared to $55.4 million for the quarter ended March 31, 2016, an increase of 14%. For the fiscal year ended March 31, 2017 net sales were $249.2 million, compared to $234.7 million for the fiscal year ended March 31, 2016, an increase of 6.2%. The increase in sales for the quarter ended March 31, 2017 can be attributed to a 17% increase in new order sales, and a 13% increase in reorder sales. Net income for the quarter ended March 31, 2017 was $7.5 million, or $0.37 diluted per share, compared to net income of $5.4 million, or $0.27 diluted per share, for the same quarter the prior year, an increase to net

income of 38%.  Net income for the fiscal year ended March 31, 2017 was $23.8 million, or $1.17 diluted per share, compared to net income of $20.6 million, or $1.02 diluted per share, for the fiscal year ended March 31, 2016, an increase to net income of 16%.  The Company's online sales for the quarter ended March 31, 2017 were approximately 83% of all sales, compared to 82% for the same quarter the prior year.

Menderes Akdag, President and CEO, commented: "We were encouraged with increases in both new order and reorder sales during the quarter, along with an accelerated increase to net income.  This increase to net income can be attributed to increased gross profit margins in the March quarter.  Gross profit as a percentage of sales increased to 35.1% for the quarter ended March 31, 2017, compared to 31.9% for the quarter ended March 31, 2016.  The increase to gross profit margin can be attributed to a product mix shift to higher margin items.  During the March quarter we acquired approximately 126,000 new customers, compared to 116,000 new customers acquired in the same quarter the prior year.  Average order value was $86 for the March quarter compared to $83 for the same quarter the prior year.  Cash flow from operations was $47.2 million for the fiscal year ended March 31, 2017, compared to $21.1 million for the fiscal year ended March 31, 2016, with the majority of the increase due to an increase in accounts payable balance and a reduction in inventory, in addition to an increase in net income.  In fiscal 2018, we will look to build on past successes by focusing on continuing to increase sales and improve our service levels."

The Board of Directors declared an increased quarterly dividend of $0.20 per share on its common stock.  The dividend will be payable on May 26, 2017, to shareholders of record at the close of business on May 19, 2017.  The Company intends to continue to pay regular quarterly dividends; however the declaration and payment of future dividends is discretionary and will be subject to a determination by the Board of Directors each quarter following its review of the Company's financial performance.

18.    On the same day, May 8, 2017, the Company held a conference call with analysts. On the call, an analyst asked for clarification on the Company's claimed "product mix shifts."  In response, Defendant Akdag stated "[a]ll I'm going to say is there's a shift to new generation medications."  Defendant Akdag also stated that "[i]n the quarter, we spent about 17% more in advertising."

19.    On May 23, 2017, the Company filed its annual report on Form 10-K for the 2017 fiscal year.  The 10-K was signed by Defendant Akdag, and reaffirmed the Company's statements about its financial results contained in the press release issued on May 8, 2017.

20.    On July 24, 2017, the Company issued a press release entitled "PetMed Express

D/B/A 1-800-PetMeds Announces Record First Quarter Financial Results." Therein, the Company, in relevant part, stated:

*First Quarter Net Income Increased 41%*

*First Quarter New Order Sales Increased 14%*

*First Quarter Online Sales Increased 12%*

DELRAY BEACH, Fla., July 24, 2017 (GLOBE NEWSWIRE) -- PetMed Express, Inc. (NASDAQ:PETS) today announced its financial results for the quarter ended June 30, 2017. Net income was $9.3 million, or $0.45 diluted per share, for the quarter ended June 30, 2017, compared to net income of $6.6 million, or $0.32 diluted per share, for the quarter ended June 30, 2016, a 41% increase to net income. Net sales for the quarter ended June 30, 2017 were $79.7 million, compared to $72.5 million for the quarter ended June 30, 2016, an increase of 10%. New order sales increased 14%, to $15.2 million for the quarter ended June 30, 2017, compared to $13.3 million for the same quarter in the prior year. The Company's online sales for the quarter ended June 30, 2017 were approximately 84% of all sales compared to 82% for the same quarter the prior year, with online sales increasing 12%.

Menderes Akdag, CEO and President, commented: "We were encouraged with increases in both new order and reorder sales during the quarter, along with an accelerated increase to net income for the second consecutive quarter. This increase to net income can be attributed to increased revenue with a shift in sales to higher margin items. Gross profit as a percentage of sales increased to 34.5% for the quarter ended June 30, 2017, compared to 31.0% for the quarter ended June 30, 2016. During the quarter ended June 30, 2017, we acquired approximately 169,000 new customers, compared to 158,000 new customers acquired in the same quarter the prior year. Average order value increased to $87 for the quarter compared to $82 for the same quarter the prior year. For the remainder of fiscal 2018 we will continue to focus on increasing sales and improving our service levels."

The Board of Directors declared a quarterly dividend of $0.20 per share on the Company's common stock. The dividend will be payable on August 18, 2017, to shareholders of record at the close of business on August 7, 2017. The Company intends to continue to pay regular quarterly dividends; however, the declaration and payment of future dividends is discretionary and will be subject to a determination by the Board of Directors each quarter following its review of the Company's financial performance.

21.     On July 31, 2017, the Company filed its quarterly report on Form 10-Q for the 2011 fiscal first quarter. The 10-Q was signed by Defendants Akdag and Rosenbloom, and reaffirmed the Company's statements about its financial results contained in the press release

issued on July 24, 2017.

22.  The above statements identified in ¶¶17-21 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company was marketing dangerous and addictive animal drugs to humans; (2) that, as such, the Company is vulnerable to potential civil or criminal liability, as well as other regulatory action; (3) that, as a result of the foregoing, Google may halt the Company's advertising activities; and (4) that, as a result of the foregoing, Defendants' statements about PetMed's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## Disclosures at the End of the Class Period

23.  On August 23, 2017, Aurelius Value published a research report on PetMed alleging, in relevant part:

> Up until now, an online pet pharmacy named PetMed Express (NASDAQ: PETS) has been able to conceal its efforts to exploit America's Opioid Epidemic.
>
> In 2015, Opioids killed 33,091 people, equivalent to one overdose death every 15 minutes. Within the past several months, many government agencies have announced Opioid task forces while Attorney Generals have expanded investigations into the "pill mills" feeding the epidemic. This month, President Trump formally designated the opioid crisis a national emergency.
>
> PetMed's origins trace to convicted felons named Yali Golan and Engin Yesil, who were imprisoned in the early 1990s for conspiracy to distribute Cocaine. Mr. Golan's status as PetMed's co-founder was hidden from investors through shell entities at the time of the company's IPO. PetMed's CEO, Menderes Akdag worked for almost a decade at Lens Express, a company that Golan and Yesil founded.
>
> Faced with increasing competition, PetMed's business had stagnated for most of the past seven years before sales and earnings suddenly began to surge. Having posted the best financial results in the company's history over the past two quarters, PETS shares have skyrocketed.
>
> Yet PetMed operates as a distributor without proprietary products in a mature industry–not exactly the dynamics that lead to sudden windfall profits. Cryptically, Mr. Akdag has repeatedly credited the company's change in fortunes to a purported "shift to new generation medications", a narrative that has enticed unsuspecting investors.

But Mr. Akdag must have thought no one would scrutinize his claims.

It is our belief that the actual "secret sauce" lies in PetMed's efforts to aggressively market dangerous painkillers to human opiate addicts and drug users.

Mr. Akdag and his team sell painkillers coveted by human opiate addicts. Chief among these is a dangerous and addicting synthetic opiate named Tramadol, unique in that it is prescribed by vets to animals as well as by doctors to human cancer patients. The demand for Tramadol, a class IV substance, is now so high that addicts are even maiming their pets to get prescriptions.

PetMed is exploiting this crisis through a broad marketing blitz that features Tramadol in ads that specifically target human opiate users.

*   *   *

Using Google, which drives over 55% of the traffic to 1800petmeds.com, PetMed has deployed a vast predatory campaign that dangles ads featuring pictures of Tramadol to drug users searching for how to get high or quickly score a variety of different opiates, narcotics, and street drugs without a prescription. Egregiously, PetMed's ads even specifically bait opiate addicts searching for *remedies* for their withdrawal symptoms.

Online advertising is the lifeblood of PetMed's business and, according to data cited in this report, Tramadol ads are estimated to drive at least 25% of PetMed's paid search traffic. It is no coincidence, in our view, that PetMed has reported record financial results over the same period that its opiate ad campaign has expanded.

We believe that PetMed's marketing of dangerous drugs to human opiate addicts is likely to capture the attention of regulators. Both the FDA and DEA have taken a dim view of direct to consumer advertisements of controlled substances and we can find no precedent of a pet pharmacy advertising to humans.

More immediately, Google can bring a sudden halt to PetMed's activities. Google has recently been on "a rampage" against predatory ads and we have notified Google of PetMed's advertising tactics. Google has strict policies for advertisers and, in our opinion, <u>Google could choose to suspend or ban PetMed altogether</u>.

PETS trades at over 30x earnings and 3x sales, a valuation that suggests the party will continue indefinitely. But for most of the last decade, PETS shares were valued at substantially lower multiples. As the true nature of PetMed's activities come to light, at minimum, we see shares reverting to below their average historical valuation, which would imply a sub $20 stock and 50%+ downside.

24.     On this news, the Company's stock price fell $3.19 per share, more than 8%, to close at $36.22 per share on August 23, 2017, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

25. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired PetMed's securities between May 8, 2017, and August 23, 2017, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

26. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PetMed's common stock actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of PetMed shares were traded publicly during the Class Period on the NASDAQ. As of July 31, 2017, PetMed had 20,604,307 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by PetMed or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

28. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

29. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of PetMed; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

31.     The market for PetMed's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, PetMed's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired PetMed's securities relying upon the integrity of the market price of the Company's securities and market information relating to PetMed, and have been damaged thereby.

32.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of PetMed's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about PetMed's business, operations, and prospects as alleged herein.

33.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or

misleading statements about PetMed's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

34. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

35. During the Class Period, Plaintiff and the Class purchased PetMed's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

36. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding PetMed, their control over, and/or receipt and/or modification of PetMed's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning PetMed, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

37. The market for PetMed's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, PetMed's securities traded at artificially inflated prices during the Class Period. On July 26, 2017, the Company's stock price closed at a Class Period high of $50.54 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of PetMed's securities and market information relating to PetMed, and have been damaged thereby.

38. During the Class Period, the artificial inflation of PetMed's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about PetMed's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of PetMed and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

39. At all relevant times, the market for PetMed's securities was an efficient market for the following reasons, among others:

(a) PetMed stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, PetMed filed periodic public reports with the SEC and/or the NASDAQ;

(c) PetMed regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     PetMed was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

40.     As a result of the foregoing, the market for PetMed's securities promptly digested current information regarding PetMed from all publicly available sources and reflected such information in PetMed's stock price. Under these circumstances, all purchasers of PetMed's securities during the Class Period suffered similar injury through their purchase of PetMed's securities at artificially inflated prices and a presumption of reliance applies.

41.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

42.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of PetMed who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

43. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase PetMed's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

45. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for PetMed's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

46. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about PetMed's financial

well-being and prospects, as specified herein.

47.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PetMed's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about PetMed and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

48.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

49.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing PetMed's financial well-being and prospects from the

investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

50. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of PetMed's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired PetMed's securities during the Class Period at artificially high prices and were damaged thereby.

51. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that PetMed was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their PetMed securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

52. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

53. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### **SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     Individual Defendants acted as controlling persons of PetMed within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

57.     As set forth above, PetMed and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  August 25, 2017         */s/ Leo W. Desmond*
                                Leo W. Desmond, Esq.
                                Florida Bar No. 0041920
                                **DESMOND LAW FIRM, P.C.**
                                5070 Highway A1A, Suite D
                                Vero Beach, Florida 32963
                                Telephone: (772) 231-9600
                                Facsimile: (772) 231-0300
                                lwd@DesmondLawFirm.com

                                **GLANCY PRONGAY & MURRAY LLP**
                                Lionel Z. Glancy (*Pro Hac Vice* to be filed)
                                Robert V. Prongay (*Pro Hac Vice* to be filed)
                                Lesley F. Portnoy (*Pro Hac Vice* to be filed)
                                Charles H. Linehan (*Pro Hac Vice* to be filed)
                                1925 Century Park East, Suite 2100
                                Los Angeles, CA 90067
                                Telephone: (310) 201-9150
                                Facsimile: (310) 201-9160

                                *Counsel for Plaintiff*